# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of:  )
)                                 Chapter 11 Case
HSD PARTNERS, LLC  )
)                                 Number <u>10-40295</u>
    *Debtor*  )
)
)
)
COMMUNITY WEST BANK  )
)                                 **FILED**
    *Movant*  )                     Samuel L. Kay, Clerk
)                     United States Bankruptcy Court
)                                 Savannah, Georgia
)                     By lbarnard at 4:22 pm, Apr 01, 2011
v.  )
)
HSD PARTNERS, LLC  )
)
    *Respondent*  )

## <u>MEMORANDUM AND ORDER</u>
## <u>ON MOTION FOR RELIEF FROM STAY</u>

Debtor's case was filed on February 7, 2010. Community West Bank filed a Motion for Relief from the Automatic Stay on July 9, 2010, and after preliminary hearings were conducted, a trial of all issues was held on October 19, 2010.

## <u>FINDINGS OF FACT</u>

Debtor is an equipment rental company which has been in business for a number of years. In 2005 the previous owners of the company sold it to the current owners, Sheree Gloss and Julian Henry Gloss. Community West Bank has an outstanding loan to

Debtor which is secured by virtually all of Debtor's personal property. That property principally consists of equipment held for rent to individuals and contractors in the construction business ("Property"). As of the date of filing of this case, Debtor owed Community West Bank $487,000.00.[1] In Debtor's schedules the Property was valued at $224,000.00. Schedule B, line 29, Dckt. No. 1 (Feb. 7, 2010). Debtor's original plan valued the Community West Bank collateral at $200,000.00 and it is undisputed that there is no equity in the assets pledged to Community West Bank. Community West Bank moves this Court for relief from stay under 11 U.S.C. § 362, alleging that there is no equity in the Property and that the Property is not necessary to an effective reorganization.

## CONCLUSIONS OF LAW

### I. Standard

Section 362(d)(2) of the United States Bankruptcy Code provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization . . . .

The United States Supreme Court, in applying § 362(d)(2) defined "necessary to an effective

---

[1] Except where the precise number is material I will utilize rounded or approximate numbers throughout this opinion.

reorganization" as requiring:

> [N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 375-76 (1988). This Court has further held that "necessary" means "logically required." In re Simmons, Case No. 10-60323 p. 7 (Bankr. S.D. Ga.) (Sep. 16, 2010); In re Benton, Case No. 09-41429 p. 6 (Bankr. S.D. Ga.) (Dec. 16, 2010). Accordingly, for property to be "necessary to an effective reorganization," it must be a logically required for a reorganization which has a reasonable possibility of succeeding within a reasonable time.

## II.  The Burden of Proof has Shifted

Pursuant to 11 U.S.C. § 362(g), once the movant has proved a lack of equity, the burden shifts to the debtor to prove that the property is necessary to an effective reorganization. In this case, there is no equity in the Property, so Debtor has the burden of proving that the Property is logically required for a reorganization which has a reasonable possibility of succeeding within a reasonable time.

### III.  The Property Is Necessary

The Property comprises virtually all of Debtor's rental inventory.  If Debtor did not have this inventory, it would have nothing to rent and it would cease operation. Accordingly, the Property is "logically required" to the success of Debtor's plan.

### IV. Debtor's Plan has a Reasonable Possibility of Success Within a Reasonable Time

Debtor's original plan proposed that Community West Bank's $200,000.00 secured claim[2] be paid off over a ten year period at an interest rate of 4%, which would have required payments of approximately $2,000.00 per month.  The original obligation incurred in 2005 was also for a ten year term, but the interest rate was a floating contract rate.  At the inception of the loan the principal was $636,000.00, the interest rate was approximately 8%, and the payments were $8,000.00 per month.  At the time of filing the principal had been reduced to $487,000.00 and the floating rate had reduced to slightly more than 5%.

Debtor's owners, Mr. and Mrs. Gloss, both work in the business with Mrs. Gloss principally involved in handling bookkeeping and accounting.  Her testimony at the October 2010 hearing, combined with  Debtor's monthly operating report for August 31, 2010, (Exhibit M-8) and other information filed with this Court, revealed that the company required $25,000.00 per month in gross sales in order to reach the break-even point before any money was available to make any payments toward debt service.

---

[2]Debtor values the Property at $200,000.00 and proposes to pay this amount as a secured claim.

☜AO 72A
(Rev. 8/82)

At the time of the October 2010 hearing, it appeared that Debtor had made approximately $16,000.00 in post-petition, year-to-date, debt service payments while accruing an unpaid post-petition year-to-date tax liability of just under $4,000.00. This resulted in a net debt service of approximately $12,000.00 over a seven month period, or approximately $1,714.00 per month.

Debtor's original proposed Plan and Disclosure Statement required a much higher debt service payment than $1,714.00 per month which, based on its 2010 expenses, left a significant negative cash flow. On October 26, 2010, while the Motion for Relief was under advisement, the Court conducted a hearing to consider that original Plan. Debtor sought a continuance—which was unopposed by all parties in interest—to file an amended plan. Debtor's counsel outlined the budget alterations and plan payment adjustments which he argued would make an amended plan feasible. I granted the Motion to Continue based on that showing. Pending consideration of the amended plan, it was impossible to rule on either the feasibility of Debtor's new plan or the Motion for Relief from Stay.

Debtor then filed an Amended Disclosure Statement and Plan in which it proposed paying Community West Bank $200,000.00 over twelve years at 5.25% interest, yielding a monthly payment of $1,874.96. Amended Disclosure Statement, Dckt. No. 102 (Nov. 19, 2010); Amended Plan, Dckt. No. 103 (Nov. 19, 2010). The Amended Plan also increased the principal to be repaid to Aurora Bank and increased the monthly debt service to $2,365.03, a figure based on a twenty year amortization at 5.25%, the terms of which have

been agreed to by those parties. The Amended Plan, however, reduced monthly payments to the SBA from $1,400.00 per month to $595.06 based on valuation of the underlying collateral and it eliminated Westside Rental's secured claim because there was insufficient collateral value to support a secured claim. Debtor also proposed a reduction in the unsecured dividend from 50% to 35.2%. There were other changes as well, but the sum and substance is that the Plan obligations were reduced to $7,770.00 per month. In addition, the Debtor followed through on its business reorganization plans by terminating two part-time employees, eliminating Mrs. Gloss's salary on an interim basis, and dropping health coverage for all employees. Debtor's projected expenses for 2011 with these adjustments total $324,266.39. *See* Exhibit D-4A.

The net effect of the reduction in the proposed plan payments, together with the reduction in forward-looking expenditures, resulted in a significantly different projection of future profitability. Those positives are at least partially offset by one negative; last fall Debtor was projecting—based on six-months of operation—approximately $376,000.00 in 2010 gross sales. However, 2010 sales actually came in lower at $347,562.57. *See* Exhibit D-1A.

Even though 2010 sales were lower than projected, Debtor expects a 2011 year-over-year increase in gross sales of 17% based on total industry projections, and therefore projects 2011 gross sales of $406,647.93. *See* Exhibit D-1A. Thus, the current plan projects an excess of sales over expenses of more than $82,000.00 for the year.

Community West Bank objects to the projection of 17% as being insufficiently specific—both to the Savannah market and to Debtor's business—for the Court to rely upon. Indeed, a comparison of the year-over-year changes in Debtor's gross sales versus industry-wide averages reveals significant differences. Debtor outperformed the industry in 2006-2007 and 2007-2008, matched the industry performance in 2008-2009 and under performed by a substantial degree the industry performance in 2009-2010. *See* Exhibits D-1A, D-2

The disparity in those year-over-year numbers certainly suggests Community West Bank's objection may have a legitimate basis. On the other hand, Debtor's actual performance in January of 2011 far exceeded the projected 17% increase over 2010. *See* Exhibit D-1A. Debtor's performance in February of 2011 was practically flat compared to 2010, but because of Debtor's strong sales in January, its 2011 year-to-date sales are still above the 2011 industry-wide forecast. *See* February Monthly Operating Report, Dckt. No. 133, p. 2 (Mar. 25, 2011). Without a longer track record in 2011 it is difficult, if not impossible, to project whether the Debtor will match the year-long projected industry growth rate of 17%, but the early numbers are encouraging.

I conclude, based on the 2011 year-over-year results, that Debtor will operate at a higher income level in 2011 than in 2010. Even assuming Debtor would do no better in 2011 then it did in 2010, its gross receipts of $347,562.00 (if replicated in 2011) would still exceed total budgeted expenses of $324,266.00, which I find to be reasonable. Mr. and Mrs. Gloss are so heavily committed to making the business succeed that the wife

is foregoing any salary until the company can afford to pay it. Debtor has been forced to drop health insurance coverage for its employees, but has explained to those employees what the alternative would be—business failure. Indications from the employees are that they understand the necessity of it and intend to remain employed with the company. This is important because two key employees (besides Mr. and Mrs. Gloss) have been with the company for more than twenty years and their experience and reputation among Debtor's customer base is a significant factor in its continued viability.

For all the foregoing reasons, while I conclude that setting a precise 2011 profit number for the company at this stage is uncertain, the evidence is sufficient to conclude that Debtor will have a positive cash flow under its proposed plan and that the Debtor has carried its burden of showing that it has a reasonable prospect for reorganization.

## V. Conclusion

The Property is logically required for Debtor's Amended Plan, and that Amended Plan has a reasonable possibility of success within a reasonable time. Accordingly, Community West Bank's Motion for Relief From Stay will be denied.

## O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Motion for Relief from Stay filed by Community West Bank is DENIED. A hearing to consider the Amended Disclosure Statement and

Amended Plan will be assigned on the Court's next available calendar.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 1st day of April, 2011.